J. Scott Russo (CA State Bar No. 155631)
Russo & Duckworth, LLP
9090 Irvine Center Drive, Second Floor
Irvine, California 92618
Telephone No. (949) 752-7106
Facsimile No. (949)752-0629

Attorneys for Plaintiff
American Cab, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

| | |
|---|---|
| AMERICAN CAB, LLC, a California limited liability company,, <br><br> Plaintiff, <br><br> v. <br><br> SUNLINE SERVICES GROUP; SUNLINE TRANSIT AGENCY, and DOES 1-100, inclusive, <br><br> Defendants. <br><br>_____ | Case No. CV 12-05552 GW (OPx) Assigned to Honorable George H. Wu <br><br> **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES; DECLARATION OF J. SCOTT RUSSO IN SUPPORT THEREOF** <br><br> Hearing on Motion: <br> Date:          April 1, 2013 <br> Time:         8:30 a.m. <br> Courtroom:   10 <br><br> Date Action Filed: June 26, 2012 <br> Trial Date: May 14. 2013 |

Plaintiff American Cab, LLC ("Plaintiff" or "American Cab") respectfully submits the following Memorandum of Points and Authorities In Opposition to Defendants SunLine Services Group ("SSG") and SunLine Transit Agency's ("STA") Motion for Summary Judgment or In the Alternative, Summary Adjudication of Issues.

## <u>TABLE OF CONTENTS</u>

I. INTRODUCTION...................................................................................... - 1 -

II. STATEMENT OF FACTS ....................................................................... - 2 -

III. LEGAL ARGUMENT ............................................................................ - 8 -

   A.   Defendants' Have Failed To Meet Their Burden Of Proof. ................ - 8 -

   B.   SSG And STA Are Factually And Legally Distinct, Separate Entities And Capable Of Concerted Action. ...................................................................... - 9 -

   C.   SSG And STA Are Not Immune From Antitrust Liability............................ - 13 -

IV. CONCLUSION...................................................................................... - 19 -

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT,
OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES

1

# TABLE OF AUTHORITIES

2

3

**Cases**

4

*American Needle, Inc. v. National Football League*

(2010) 130 S.Ct. 2201 .............................................................. - 5 -, - 6 -, - 7 -

*Birkenfeld v. City of Berkeley*

(1976) 17 Cal.3d 129 .................................................................- 10 -

*California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.*

(1980) 445 U.S. 97, 100 S.Ct. 937 ...........................................- 9 -

*Carter v. Clark* (1936) 298 U.S. 238, 311, 56 S.Ct. 855.....................- 1 -

*City of Columbia v. Omni Outdoor Advertising, Inc.*

(1991) 499 U.S. 365, 111 S.Ct. 1344 .......................................- 10 -

*City of Lafayette v. Louisiana Power & Light Company*

(1978) 435 U.S. 389, 98 S.Ct. 1123 ........................................- 9 -

*Coast Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*

(9th Cir 1996) 99 F.3d 937 .......................................................- 9 -

*Community Communications Co. v. City of Boulder*

(1982) 455 U.S. 40, 102 S.Ct. 835 ...........................................- 11 -

*Copperweld Corporation v. Independence Tube Corporation*

(1984) 467 U.S. 752, 104 S.Ct. 2731 ....................................... - 6 -, - 7 -

*Cotta v. City and County of San Francisco*

(2007) 157 Cal.App.4th 1550 ...................................................- 10 -

*Fontenot v. Upjohn Co.*

(5th Cir 1986) 780 F.2d 1190 ...................................................- 5 -

*Freeman v. San Diego Association of Realtors*

(9th Cir. 2003) 322 F.3d 1133 ..................................................- 6 -

*Goldfarb v. Virginia State Bar*

(1975) 421 U.S. 773, 95 S.Ct. 2004 .........................................- 9 -

ii

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT,
OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES

1

2 *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*

3 (2nd Cir. 1999) 182 F.3d 157 ....................................................- 5 -

4 *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*

5 (9th Cir. 2000) 210 F.3d 1099....................................................- 5 -

6 *Parks v. Watson*

7 (9th Cir. 1983) 716 F.2d 646 .....................................................- 9 -

8 *Shames v. California Travel and Tourism Commission*

9 (9th Cir. 2010) 626 F.3d 1079....................................................- 9 -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT,
OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

"[O]ne person may not be intrusted in the power to regulate the business of another, and especially of a competitor. And a statute which attempts to confer such power undertakes an intolerable and unconstitutional interference with personal liberty and private property." *Carter v. Clark* (1936) 298 U.S. 238, 311, 56 S.Ct. 855.

In this case, the cities and county in the Coachella Valley formed a joint powers authority for a transit agency (STA) whose sole purpose is providing public transportation in the form of busses and ADA transportation, Dial-A-Ride. The same cities and county later formed a second joint powers authority (SSG) to operate a compressed natural gas (CNG) fueling station to be located at STA. The agreement for SSG expressly states that SSG cannot be involved in activities that are "transit related"[1] and the board members and general manager will be the same as STA.

Later the cities and county gave SSG authority over all taxi regulation for the Coachella Valley, but they neglected  to change the requirement that the boards and general manager for STA and SSG would be the same people. The taxi companies are in competition with STA so STA, through SSG, is regulating its competition. The STA/SSG board has created rules and enacted an ordinance which prevents the taxi franchises from growing, being profitable and competing with STA. The Chairman of the Boards of STA and SSG has publically admitted over and over that the

---

[1] "Transit is defined as "the conveyance of persons or things from one place to another." Merriam Webster Dictionary.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT,
OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES

taxi companies are in competition with STA and there is a clear conflict of interest in the "two hats" the board members wear.

By this lawsuit, American Cab is seeking an order for either (1) that taxi regulation be moved to a different agency whose board members and management are not conflicted, or (2) that SSG delegate taxi regulation to an advisory board and different management as is specially allowed under the California's joint powers authority law.[2] At a minimum, American Cab is requesting an order striking the rules enacted by SSG which restrain free trade.

In this Motion, Defendants don't seem to dispute that the have engaged in a combination or conspiracy in restraint of free trade, but rather they seek summary judgment based on their defenses of "no concerted action" and State Action Immunity. Defendants rely 100% on the joint powers authority agreements and do not make any attempt to consider the facts and implications. When the actual facts are considered, it is clear that Defendants' have not carried their burden for summary judgment or adjudication.

## II. <u>STATEMENT OF FACTS</u>

In 1977, the nine Coachella Valley cities and the County Riverside formed STA pursuant to a joint powers agreement. STA's sole purpose is

---

[2] Government Code Section 6508, which is in the heart of the joint powers agency statutes, states, in pertinent part, "The governing body so created shall be empowered to delegate its functions to an advisory body or administrative entity for the purposes of program development, policy formulation, or program implementation, provided, however, that any annual budget of the agency to which the delegation is made must be approved by the governing body of the Joint Powers Agency.

to provide public transportation, specifically fixed route busses and curb to curb ADA Dial-A Ride transportation. STA's Dial-A-Ride is called "Sundial". [Uncontroverted Fact ("U.F." Nos. 1 and 12].

In 1993, the same nine Coachella Valley cities and the County of Riverside formed another joint powers agency, SSG. SSG's sole purpose was to provide a CNG filling station. The joint powers agreement for SSG expressly states that SSG cannot be involved in activities that are "transit related" and the board members and General Manager will be the same as STA. [U.F. Nos. 2-5; SSG SSG Joint Powers Agreement (Defendants' Ex. B)].

Although Defendants have not produced an enabling document, sometime after 1993 the nine cities and County executed an agreement implementing the additional grant of power to SSG, taxi regulation. [SSG Ordinance No. 2012-01 (Plaintiff's Ex. 6). The requirement that the STA and SSG boards and general manager be the same was not changed. [U.F. Nos. 4-5, 8-9]. Apparently, the CNG filling station became part of STA. SSG's sole business is taxi regulation. [U.F. No. 13].

STA and SSG are different entities with different purposes.[U.F. No. 11].

American Cab is a taxi company located in Thousand Palms, California. American Cab is one of only three authorized taxi franchises in the Coachella Valley. The other two franchises are Yellow Cab of the Desert ("Yellow Cab") and Desert City Cab ("City Cab").  SSG has issued 180 total taxi permits, and American Cab has received 45 permanent permits and 25 temporary permits. [Declaration of Harry Incs ("Incs Decl.") ¶1-2].

American Cab's business model is different from Yellow Cab and City Cab.  American Cab has reinvested all profit back into the business so

that it is capitalized to invest and expand. None of the managers of American Cab are taxi drivers. American Cab advertises heavily while Yellow Cab and City Cab do not. American Cab has purchased the best available reservation, dispatch, GPS and communications hardware and software, and has paid much more for its fleet to include hybrid cars. American Cab also invested in the purchase of ADA compliant vans to serve disabled customers. American Cab has built a state of the art headquarters and auto maintenance facility. As a result of its superior investment and effort, American Cab accounts for about 45% of all the taxi rides in the Coachella Valley. On average, the American Cab cars provide about 50% more rides each day per car than either Yellow Cab or City Cab, with most of the rides being dispatched. [Incs Decl. ¶3]

American Cab follows the business model of most California taxi companies. The SSG permitted cars are leased to the drivers on a weekly basis to drivers who are independent contractors. The cars are fully loaded with computers, credit card machines and communications hardware. American Cab does not receive any income from the customers, nor do the drivers account to American Cab for their fare income or tips. In addition to the loaded vehicles, what American Cab provides is the dispatching of customer calls for rides. The rates that American Cab can charge for a car lease is a direct function of the number rides that American Cab is dispatching to the drivers. The more calls that can be reasonably assured to the drivers causes the lease rates to increase, and when the number of calls increases past the point that the drivers cannot timely respond more cars and drivers should be added. When the number of calls slow down, lease rates decrease. All of American Cab's marketing and advertising efforts are to keep the call volume up all year. American

Cab's only income is from the car leases and from third party advertising on the cars. [Incs Decl. ¶4].

American Cab has never needed to reduce the number of cars due to a lack of sufficient business to maintain a minimum number of calls for each driver.  However, the number of calls is less during the June-October period, when there is less tourism in the Coachella Valley, so it is hard for the drivers to make a reasonable income. [Incs Decl. ¶5].

There is a minimum number of cars that any properly run taxi company needs to prosper due to the large capital investment and operating costs. 100 cars is the accepted number in the industry to make the expected return to justify the investment required for a modern taxi company. [U.F. No. 21].

American Cab has applied for additional taxi permits many times, justifying its request with SSG's reports on the ridership for the three franchises.  American Cab has the call volume and ridership to justify having 100 cars on the road from November-May.  The only concession granted by SSG has been the 25 temporary permits. SSG's explanation for not granting American Cab more taxi permits is so that American Cab does not become a "de facto monopoly". [Incs Decl. ¶7.].

American Cab participates in the federally funded Taxi Voucher program which STA administers. Customers apply to STA for taxi vouchers whereby the customer pays 50% of the regular fare and the remainder is paid to taxi company from federal funds. Customers qualify if they are disabled or over 60 years old. [Incs Decl. ¶8-9].

STA  provides the public bus service and a curb to curb on demand paratransit service for persons qualified under ADA, a program STA named "SunDial". [Incs Decl. ¶10].

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES

To the extent permitted by SSG, American Cab competes directly with STA for customers, particularly for disabled customers. Using their ADA vans, the taxi companies can transport disabled customers more efficiently and more cost effectively than STA. For SunDial, STA uses salaried drivers who drive 20+ passenger shuttle busses to transport what is generally one or two customers at a time. STA has already acknowledged that the taxi companies should be competing to provide Dial-A-Ride. If the taxi franchises were permitted to fairly compete for ADA transportation, it would permit them to remain busy consistently and not just during the tourist season. [U.F. Nos 14 & 23; Incs Decl. ¶11].

The SSG board has enacted SSG Ordinance No. 2012-01 (the "Ordinance"), which is the taxi ordinance establishing the rules that the taxi franchises must abide by [Plaintiffs Ex. 6]. The SSG board also enacted Taxicab Regulations to supplement the Ordinance [Plaintiff's Ex. 7].

The STA board members, when they puts on their SSG hats, establish the rates the taxi drivers can charge customers, the rider surcharges and the fees charged to the franchises.  On a per taxi basis the cost of regulation by SSG is the highest in California, and 2-3 times as much as the next highest taxi regulatory agency. SSG sets the rider surcharges and fees charged to the drivers and franchises based on its budget. The high regulatory fees and surcharges causes high taxi fare rates which drives customers to STA as a less expensive alternative. [U.F. No. 22 & 35].

The STA board has a conflict of interest when it also acts as the SSG board, a fact repeatedly admitted by the Chairman of the Board of STA and SSG. [U.F. No. 15]. In fact the Chairman of the Board(s) admits that the STA board is obligated to expand the business of STA and maximize its farebox revenue but feels no duty to assist the growth of the

taxi franchises. [U.F. Nos. 16 & 18]. The General Manager(s) admits that it is his job to expand the ridership for STA's busses and ADA transportation and grow its farebox revenue, but he feels no duty to help the taxi franchises grow. [U.F. No. 17 & 19].

While the conflict of interest in the "two hats" worn is admitted, neither the Chairman of the Board(s) or the General Manager(s) can articulate any reason or logic for why the STA and SSG boards are the same. [U.F. No. 20].

An example of the SSG board restricting the taxi franchises to benefit STA is its enactment of Ordinance Section 1.225, which states:

"No Franchisee nor representative of a Franchisee, including any Driver or agent acting on behalf of a Franchisee, shall make arrangements in exchange for compensation for exclusive or preferential service rights with any venue, business establishment or public transportation facility within the jurisdiction of SSG which generates Taxicab transportation service trips." [Plaintiff's Ex. 6, p. 33]

Section 1.225 effectively prevents the taxi franchises from doing anything to increase their business other than perhaps advertising. No taxi franchise can be rewarded for superior service. If a hotel, hospital, dialysis center or convention organizer wants to make American Cab its preferred provider, if American Cab agrees it is in violation of the Ordinance and its franchise can be terminated. [U.F. No. 26]. The General Manager cannot articulate any way for the taxi franchisees to expand their business when faced with Section 1.225 [U.F. No. 28]. The Chairman of the Board(s) cannot cite any logical reason for the prohibition of Section 1.225. [U.F. No. 27].

But for Section 1.225, American Cab would be able to establish preferred or exclusive service agreements with hotels, hospitals and medical providers, venues and businesses which would enable American Cab's drivers to remain busy all year.  Because the taxi franchises are prohibited from having any relationships to increase the number of rides, enable a reduction of rates, keep the drivers busy all year and cause a demand for more taxis, the customers do not use taxis and are driven to the transportation provided by STA. [Incs Decl. ¶¶17-19].

Other than lease revenue, the only other source of income for American Cab is third party advertising on the vehicles. Neither the Ordinance or Taxi Regulations provide any express rules regarding third party advertising. However, the rule is that the STA Chief of Staff who is also the SST Taxi Administrator, Ms. Nightingale [U.F. No. 24], must give prior approval of the content and placement of any advertisement.  Ms. Nightingale is also the person who approves that third party advertising on STA's busses. [U.F. No. 29].

American Cab objects to being regulated by SSG because its controlled by its American Cab's biggest competitor, STA.  Through the Ordinance and decisions by STA/SSG boards and staff, American Cab is held down, cannot fairly compete and is prevented from growing and profiting from is investment.

### III. **LEGAL ARGUMENT**

A.    Defendants' Have Failed To Meet Their Burden Of Proof.

Because summary judgment is a drastic device, cutting off a party's right to present its case to a jury, the moving party bears a "heavy burden" of demonstrating the absence of any triable issue of material fact. *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.* (2nd Cir. 1999) 182 F.3d 157, 160.  A party "must establish beyond peradventure *all* of the

essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.* (5th Cir 1986) 780 F.2d 1190, 1194. "A moving party without the ultimate burden of persuasion at trial – usually but not always the defendants – has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.* (9th Cir. 2000) 210 F.3d 1099, 1102. If the moving party fails to carry its initial burden of production, the opposing party has no obligation to produce anything. *Id.*, at 1102-1103.

Defendants have produce very little if any evidence that supports their claim that they are entitled to summary judgment in the instant matter. For the most part, their Motion is supported by conclusory allegations based solely on the existence of the STA and SSG joint powers agreements. This does not meet their heavy burden.

B.    SSG And STA Are Factually And Legally Distinct, Separate Entities And Capable Of Concerted Action.

In their Motion, Defendants state that because the Boards and General Managers of SSG and STA are identical, they are therefore one entity and incapable of conspiring with one another and, therefore, are not subject to the Sherman Act. (Motion, pp. 5-7, 12-13.) Defendants selectively cite to *American Needle, Inc. v. National Football League* (2010) 130 S.Ct. 2201 ("*Am. Needle*") contending that because SSG and STA have identical centers of decision making, they are in fact one entity. This argument is a red herring. In reality, the Court in *Am. Needle*, actually found that while separate entities may be comprised of identical members, they have separate and distinct economic interests and therefore are capable of concerted action in violation of the Sherman Act.

1    The Court in *Am. Needle* cited extensively to the holdings in

2  *Copperweld Corporation v. Independence Tube Corporation* (1984) 467

3  U.S. 752, 104 S.Ct. 2731 ("Copperweld") for the proper analysis in

4  determining whether or not parties are subject to liability under the

5  Sherman Act.

6    "As *Copperweld* exemplifies, 'substance not form, should determine

7  whether a[n] … entity is capable of conspiring under § 1.'" *Am. Needle*, at

8  2211 (citing *Copperweld*, at 773, n. 21, 104 S.Ct. 2731).

9    As the *Am. Needle* Court concluded "'[T]heir general corporate

10  actions are guided or determined' by 'separate corporate

11  consciousnesses,' and '[t]heir objects are' not 'common.'" *Am. Needle*, at

12  2212 (citing *Copperweld*, at 771, 104 S. Ct. 2731).

13    When entities are acting as "'separate economic actors pursuing

14  separate economic interests,'" there is a potential of "'independent

15  center[r] of decisionmaking'." *Am. Needle*, at 2213 (citing *Copperweld*, at

16  769, 104 S.Ct. 2731.).

17    "Concerted activity inherently is fraught with anticompetitive risk. It

18    deprives the marketplace of the independent centers of

19    decisionmaking that competition assumes and demands. In any

20    conspiracy, two or more entities that previously pursued their own

21    interests separately are combining to act as one for their common

22    benefit. This not only reduces the diverse directions in which

23    economic power is aimed but suddenly increases the economic

24    power moving in one particular direction. Of course, such mergings

25    of resources may well lead to efficiencies that benefit consumers, but

26    their anticompetitive potential is sufficient to warrant scrutiny even in

27    the absence of incipient monopoly." *Copperweld*, at 768-769, 104

28    S.Ct. 2731.

When determining the capability of concerted activity between corporations, the Court in *Freeman v. San Diego Association of Realtors* (9th Cir. 2003) 322 F.3d 1133 undertook the following analysis:

> The theme in these cases is economic unity. Where there is substantial common ownership, a fiduciary obligation to act for another entity's economic benefit or an agreement to divide profits and losses, individual firms function as an economic unit and are generally treated as a single entity. *Id.*, at 1148.

> Although the single-entity inquiry is fact-specific, a few general guidelines emerge. First, in the absence of economic unity, the fact that joint venturers pursue the common interests of the whole is generally not enough, by itself, to render them a single entity. "[A] commonality of interest exists in every cartel." [Citations omitted.] *Id.*

> Second, in the absence of economic unity, the fact that firms are not actual competitors is also usually not enough, by itself, to render them a single entity. *Id.*, at 1148-1149.

In determining whether or not two separate entities exist capable of concerted activity, various issues are key to the analysis: (1) what is the functional difference in the conduct of which the entities actually operate (*Am. Needle*, at 2209); (2) are the entities comprised of separate economic actors pursuing separate economic interests (*Copperweld*, at 769, 104 S.Ct. 2731); and (3) is there a unity of purpose or common design (*Id.*).

Defendants' own admissions belie the contention that they are one entity incapable of concerted action. The Joint Rule 26(F) Report states as follows:

> Sunline Services Group is a public agency and a joint powers authority created in 1993. by the nine Coachella Valley cities to procure and dispense compressed natural gas fuel to the fleet of busses owned and operated by Sunline Transit Agency. In 1996, the nine Coachella Cities

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES

amended the **Sunline Services Group JPA to authorize it to regulate taxicabs in the Coachella Valley in 1996. Sunline Transit Agency, a separate governmental agency and joint powers authority, was created in 1977 to provide and operate a public transportation system in the Coachella Valley through the operation of a bus system.**  As required by state and Federal law, Sunline Transit Agency also provides ADA required parallel service in the form of a Dial-A-Ride program.

Sunline Services Group has established Sunline Regulatory Agency to perform the taxi regulatory function.  The two governmental entities, Sunline Transit Agency and Sunline Services Group have certain employees, facilities and resources in common, **but each governmental entity is independently responsible for its proportionate share of any such employees, facilities and resources.** (Emphasis added.)  (Register of Actions No. 16, p. 2, lns. 4-18.)

Further, The Joint Power Agreements of each of these entities confirm that SSG and STA have separate economic interests.  The economic interest of STA is to provide a public transit system in the Coachella Valley, specifically busses and vehicles for the disabled.  The economic interest of SSG is the regulation of the taxi industry.

In the instant matter, SSG and STA do not function as an economic unit in operation or provision of services to the public.  They do not share profits or losses.  The fact that they are not competitors is irrelevant.

Defendants' argument that because the Boards of SSG and STA are identical and therefore have the same centers of decisionmaking, is form over substance.  The fact that the Board of SSG is the same as the Board of STA does not shield them from the fact of their "concerted action".  STA and SSG hold monthly Board meetings.  The STA meeting and the SSG meeting are held in the same location, but are held at different times, with completely different agendas and discussion topics.  The STA meeting

1  addresses issues relating to public transportation vis-à-vis bus

2  transportation and Dial-A-Ride.  The SSG meeting addresses issues

3  relating to the taxi industry.  In essence, what occurs is that the Board

4  members must transition from their "STA hat" to their "SSG hat".

5       As set forth above, when looking to substance over form, STA and

6  SSG are factually and legally distinct entities each pursuing their own

7  economic interests.  As such, Defendants are open to scrutiny under the

8  Sherman Act.

9       C.    SSG And STA Are Not Immune From Antitrust Liability.

10      Defendants contend that because they are a municipality regulating

11  taxis pursuant to a state policy, they are immune from liability.  American

12  Cab does not dispute that taxi cabs are subject to local regulation.  What

13  American Cab does dispute is the way in which it is regulated, the parties

14  actually doing the regulating, whether or not such regulation is in

15  conformance with the legislative intent and mandate, whether or not the

16  regulation is reasonable and whether or not Defendants' regulation is in

17  furtherance of the legislative objectives.

18      "The state-action immunity doctrine is 'disfavored,' and is to be

19  interpreted narrowly, as 'a broad interpretation of the doctrine may

20  inadvertently extend immunity to anticompetitive activity which the states

21  did not intend to sanction.'" *Shames v. California Travel and Tourism*

22  *Commission* (9th Cir. 2010) 626 F.3d 1079, 1084 (citing *Coast Mgmt*.

23  *Servs., Inc. v. Wash. Nat. Gas Co.* (9th Cir 1996) 99 F.3d 937, 941).

24      The "challenged restraint must be 'one clearly articulated and

25  affirmatively expressed as state policy'."  *California Retail Liquor Dealers*

26  *Association v. Midcal Aluminum, Inc.* (1980) 445 U.S. 97, 105, 100 S.Ct.

27  937, 943.  "'It is not enough that . . . anticompetitive conduct is 'prompted'

28  by state action; rather, anticompetitive activities must be compelled by

direction of the State acting as a sovereign.'" *Id.*, at 104, 100 S.Ct. 937, 943 (quoting *Goldfarb v. Virginia State Bar* (1975) 421 U.S. 773, 791, 95 S.Ct. 2004, 2015).

"A state may unintentionally create a scheme that in some way fosters anticompetitive conduct. But this unintended consequence—even if foreseeable—does not satisfy the 'clear articulation' prong of *Midcal* because the underlying scheme does not indicate an intention to displace competition. *Shames, supra,* (9th Cir. 2010) 626 F.3d at 1084.

To prove that a policy is clearly articulated and affirmatively expressed, the sovereign must demonstrate not only the existence of a state policy to displace competition with regulation, but also that the legislature contemplated the kind of actions alleged to be anticompetitive. *Parks v. Watson* (9th Cir. 1983) 716 F.2d 646, 663.

The impact which local governments, acting as providers of services, may have on other individuals and business enterprises with which they compete may subject the government to antitrust violations. *See City of Lafayette v. Louisiana Power & Light Company* (1978) 435 U.S. 389, 403, 98 S.Ct. 1123, 1132.

As was said in the *City of Lafayette, supra*:

> In 1972, there were 62,437 different units of local government in this country. Of this number 23,885 were special districts which had a defined goal or goals for the provision of one or several services, while the remaining 38,552 represented the number of counties, municipalities, and townships, most of which have broad authority for general governance subject to limitations in one way or another imposed by the State. These units may, and do, participate in and affect the economic life of this Nation in a great number and variety of ways. When these bodies act as owners and providers of services, they are fully capable of aggrandizing other economic units with which they interrelate, with the potential of serious distortion of the rational and efficient allocation of resources, and the

efficiency of free markets which the regime of competition embodied in the antitrust laws is thought to engender. If municipalities were free to make economic choices counseled solely by their own parochial interests and without regard to their anticompetitive effects, a serious chink in the armor of antitrust protection would be introduced at odds with the comprehensive national policy Congress established.  (*Id.*, at 407-408, 98 S.Ct. 1123, 1134.)

"Often referred to as the 'police power,' this constitutional authority of counties or cities to adopt local ordinances is ' 'the power of sovereignty or power to govern-the inherent reserved power of the state to subject individual rights to reasonable regulation for the general welfare.' [Citation.] The police power extends to legislative objectives in furtherance of public peace, safety, morals, health and welfare.  *Cotta v. City and County of San Francisco* (2007) 157 Cal.App.4th 1550, 1557 (quoting *Birkenfeld v. City of Berkeley* (1976) 17 Cal.3d 129, 160).

Immunity is not afforded a municipality when "a municipality acts beyond its delegated authority, for *Parker* purposes, whenever the nature of its regulation is substantively or even procedurally defective. On such an analysis it could be contended, … if it was not, as that statute requires, adopted 'for the purpose of promoting health, safety, morals or the general welfare of the community'" immunity does not apply.  *City of Columbia v. Omni Outdoor Advertising, Inc.* (1991) 499 U.S. 365, 371, 111 S.Ct. 1344, 1349.

Restriction of competition by a municipality for purposes of private gain is not immune and subject to antitrust scrutiny.  *Id.*, at 378, 111 S.Ct. 1344, 1353.  "A State that allows its municipalities to do as they please can hardly be said to have contemplated the specific anticompetitive actions for which municipal liability is sought. Nor can those actions be truly described as comprehended within the powers *granted,* since the

term, granted, necessarily implies an affirmative addressing of the subject by the State.  *Community Communications Co. v. City of Boulder* (1982) 455 U.S. 40, 102 S.Ct. 835, 843.

"While *Parker* recognized the States' freedom to engage in anticompetitive regulation, it did not purport to immunize from antitrust liability the private parties who urge them to engage in anticompetitive regulation." *Id.*, at 379, 111 S.Ct. 1344, 1353.

Here, Defendants simply claim that because they are a municipality, they are entitled to hide under the blanket protection of immunity.  In their Motion, Defendants do not provide one shred of evidence that the conduct they are undertaking entitles them to immunity.  They do not provide one scintilla of evidence that the conduct they are undertaking is dictated or contemplated by the legislature.  They do not produce any evidence that their conduct is for the health, safety, morals or welfare of the Coachella Valley.

American Cab does not dispute that the legislature provides for the regulation of the taxi cab industry.  American Cab does not necessarily dispute that SSG, in a vacuum, can enact an ordinance that "chills" competition amongst the various taxi companies. However, American Cab does dispute that the Ordinance, and the method and actions used by Defendants, wearing "two hats", to regulate the taxi cab industry to benefit STA violates the Sherman Act.  American Cab contends, and has produced evidence, that Defendants have enacted regulations that prevent American Cab, and others, from fairly competing for transportation service customers.

Do Defendants seriously contend, in regulating the taxi cab industry, that:

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT,
OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES

1      (1) Defendants' concerted action of enacting an ordinance

2   that prevents American Cab from making arrangements for exclusive or

3   preferential services with any business establishment or public

4   transportation facility, while STA has no such restriction, was dictated or

5   contemplated by the legislature, foreseeable or for the general welfare of

6   the public?

7      (2) Defendants' concerted action of requiring surcharges to

8   be paid by every taxi rider to fill budget shortfalls caused by inefficient

9   regulation, thereby making STA more attractive than taxis to riders, was

10  dictated or contemplated by the legislature, foreseeable or for the general

11  welfare of the public?

12     (3) Defendants' concerted action of limiting the number of

13  dispatched calls any taxi franchisee can expect by forbidding any

14  agreement which would having the effect of increasing the number of calls

15  for service, thereby decreasing the amount that can be reasonably

16  charged for taxi leases and decreasing the number of taxis, was dictated

17  or contemplated by the legislature, foreseeable for the general welfare of

18  the public?

19     (4) Defendants' concerted action of limiting the number of

20  taxi permits so American Cab cannot reach reasonable profitability and

21  reduce its lease rates, so that drivers can in turn reduce meter rates for

22  customers, to make STA more attractive, was dictated or contemplated by

23  the legislature, foreseeable or for the general welfare of the public?

24     (5) Defendants' concerted action of dictating the total

25  number of taxi cab permits and thereby making fewer taxi cabs available

26  to serve the general public, causing long wait times, resulting in STA

27  benefiting by the unavailability of taxi service, was dictated or

28

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT,
OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES

contemplated by the legislature, foreseeable or for the general welfare of the public?

        (6)    Defendants' concerted action of giving the STA Chief of Staff discretion over the advertising on the exterior of the taxi cabs, controlling the taxi companies ability to add needed revenue, while STA is trying to maximize its own advertising revenue and competing for advertisers, was dictated or contemplated by the legislature, foreseeable or for the general welfare of the public?

        (7)    Defendants' concerted action to deprive the taxi cabs direct access to the public for transportation at large events in the Coachella Valley, while seeing preferred access for STA, was dictated or contemplated by the legislature, foreseeable or for the general welfare of the public?

        (8)    Defendants' concerted action to prohibit the taxi cab industry from competing with STA for provision of Dial-A-Ride services and other similar programs for the disabled, was dictated or contemplated by the legislature, foreseeable or for the general welfare of the public?

In reality, what Defendants have done by wearing "two hats" and enacting the Ordinance is prevent or limit the taxi cab industry's access to the general public and, as a result, provided STA with greater access to the general public, thereby increasing STA's revenue. SSG is wielding its regulatory powers for the benefit of STA, all to the detriment of American Cab. These actions were certainly not contemplated by the legislature, or reasonably foreseeable, when it provided municipalities with the ability to regulate the taxi cab industry. As such, Defendants are not immune from liability.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT,
OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES

# IV. CONCLUSION

As the Supreme Court stated 86 years ago in *Carter*, cited in this introduction, a person may not be entrusted in the power to regulate one's competitor. STA is in competition with the taxi franchises. The structure of STA and SSG, specifically the "two hats"  their Board members and General Manager wear, causes an unavoidable conflict of interest. Unfortunately, the Board and General Manager have resolved their conflict by simply disregarding it and making every decision in a manner that favors STA and restrains free trade by the taxi franchises, and specifically American Cab. The Board members and General Manager champion STA to maximize its growth and reach, while admitting that they do not feel any similar duty to the taxi franchises. It is indisputable that Ordinance §1.225 unreasonably restrains free trade by the taxi companies to the benefit of STA.

It appears obvious that the SSG was never intended to be the taxi regulator since its joint powers agreement expressly forbids it to engage in "transit related" activities, and taxi regulation certainly is "transit related". It is transparent that since SSG was prohibited from "transit related" activities, there would be no conflict of interest in having the STA Board and General Manager also be the SSG Board and General Manager. The arguments now by American Cab seem to be exactly what was meant to be prevented by the drafters of the SSG joint powers agreement.

American Cab simply is requesting that it be regulated by a Board and manager with no conflict, agenda or bias. Specifically, American Cab is requesting that it be regulated by a regulator whose goals are both public safety <u>and</u> the prosperity of the taxi industry, the drivers and the owners.

1    For the foregoing reasons, American Cab respectfully submits that

2   Defendants' have not carried their burden so their Motion must be denied

3   in its entirety.

4

5

6                                    RUSSO & DUCKWORTH, LLP

7

8   Dated:  March 11, 2013        By: _____

9                                    J. Scott Russo
                                     Attorneys for Plaintiff American Cab,
10                                   LLC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT,
OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES